IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

**KAREN ADAMS, Individually and
On behalf of all others similarly situated,**

**Plaintiff,**

**v.**                                         Civil Action No. ___3:15-cv-3592___

**ARNE DUNCAN, in his capacity as
Secretary of the United States Department of
Education,**

**Defendant.**

## CLASS ACTION COMPLAINT

The plaintiff for her complaint states the following:

1.  The plaintiff is a citizen of the State of West Virginia, and has resided in Nitro, Putnam County, West Virginia since approximately 1992.

2.  The defendant was born in 1955. She attended school through the 11th grade but did not graduate and has not obtained a GED. The plaintiff was awarded Supplemental Security Income benefits in 1997 based on a variety of medical impairments, including mild retardation, minimal literacy and dependant personality syndrome. This is her sole source of income. The plaintiff presently receives about $650.00 a month in SSI benefits.

3.  Plaintiff lived in Florida with both her parents until her mid-twenties, when her step-father took a job outside the United States. For a period of time she resided in a Tampa shelter, ultimately leaving Florida with a friend and re-locating to West Virginia in 1992.

4. During plaintiff's Florida residence, the for-profit school PTC Institute (RETS) operated at 9560 N. Florida Avenue in Tampa.  The address is currently the site of a car dealership.   A 1986 loan of $2500.00 purportedly issued to permit plaintiff's attendance at this educational institution constitutes the principle matter at issue in this action[i].

5. The defendant is sued in his capacity as Secretary of the United States Department of Education.

6. This claim is brought for mandatory and injunctive relief and such other relief as may be available at law under 5 U.S.C. 701et seq; 28 U.S.C. § 1331, the Administrative Procedure Act and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*. This action prays for mandatory and prohibitory injunction, and other relief, as set forth below.

7. As set forth below in more detail, the plaintiff contends that in 2007 the United States Department of Education attempted to rehabilitate the PTC (RETS) student loan allegedly taken out by her in 1986. The loan was deemed rehabilitated and sold to SunTrust. SunTrust in turn hired the Pennsylvania Higher Education Assistance Agency, an agency of the Commonwealth of Pennsylvania, (PHEAA) to collect the loan.  The plaintiff made payments to PHEAA but eventually sought the advice of counsel regarding certain collection tactics engaged in by PHEAA.  The plaintiff filed suit in Putnam County, West Virginia Circuit Court alleging violations of the West Virginia Consumer Protection Act against SunTrust and PHEAA.  The plaintiff settled with SunTrust.  After extensive briefing, the Putnam County Circuit Court ruled from the bench that it was dismissing the case as pre-empted by Federal law, but as of this date the Order has not been entered.

8.  This case is based on information which came to light during the course of the Putnam County litigation.

9.  In 2014, plaintiff learned of a 1995 determination by the Department of Education that PTC (RETS) had persistently violated various provisions of the relevant regulations, including but not limited to the "ability to benefit" requirements.  As a result, in 2014, the loan was forgiven and the plaintiff repaid certain money which she had paid pursuant to collection efforts taken by the purchasing lender, SunTrust, and its collection agency, Pennsylvania Higher Education Assistance Agency, an agency of the Commonwealth of Pennsylvania.

10. As set forth below in more detail, the plaintiff here contends that the Department of Education acted knowingly and recklessly by selling as rehabilitated a loan which it had earlier determined was in fact subject to a "blanket discharge" based on the wrongful conduct of  PTC (RETS). The Department of Education knew at all relevant times herein that SunTrust, having purchased the loan, would proceed to collect it, either directly or through another agency.

11. As a result, the plaintiff was subjected to unreasonable collection efforts and was required to pay a portion of her meager income in repayment of a loan for services allegedly provided by a school which the Department of Education itself had found to have engaged in fraudulent conduct.

12. The conduct at issue here constitutes the consummation of the agency's decision making process in that the Agency had rehabilitated the loans and sold them.  That action determined the enforceability of the loans and the legal responsibility of the plaintiff and the class members for the loans.  As set forth below in more detail, the plaintiff directs its

3

claim against the agency action of selling as rehabilitated certain loans, without determining whether such loan were actually "enforceable" as required by the agency's rules and regulations.

13. As set forth below in more detail, the 1986 loan was made by Florida Federal Savings Loan, which was itself along with two FFSL executives convicted of fraudulently submitting 17,000 allegedly nonperforming student loans for repayment by the federal government. Florida Federal Savings and Loan ultimately failed.

14. Sometime in 2007, the plaintiff was contacted by Collectcorp, acting through its agents, regarding the collection of a past due debt. The plaintiff was told by CollectCorp's agent that if she did not make payments on the debt, she would lose her Supplemental Security Income benefits. The Plaintiff thereafter signed a reaffirmation agreement, under duress, dated October 8, 2007. This agreement was drafted by Collectcorp and tendered to the plaintiff for signature, without amendment by her.

15. Collectcorp is an established Department of Education contractor.

16. On October 18, 2007, the loan was sold by the Department of Education to SunTrust, as a rehabilitated loan. Thereafter, the plaintiff was contacted by American Educational Services, a "trade name" of the Pennsylvania Higher Education Assistance Agency, an agency of the Commonwealth of Pennsylvania, which provides loan services to student loan lenders. Attached hereto as Exhibit A is the contract and list of loans transferred to SunTrust, along with the plaintiff's loan.

17. The Federal Rehabilitation Loans Lender Participation Agreement between the Department of Education and Suntrust, dated October 16, 2007, with signatures dated October 17th and October 18th, specifically provides that:

4

ED and Lender each represent that this Agreement is duly executed by their authorized representatives, and is a valid, binding obligation of each party enforceable in accordance with its terms. ED further represents that the Loans are not subject to any liens or encumbrances; **that as of the date of sale the Loans in the sale portfolio are eligible for guarantee**; that the Loans bear the interest rate, and are entitled to the benefits, in accordance with the requirements of the Higher Education Act of 1965, as amended (the "Act"), for loans of that type; that any information on Loan balances and periods of prior deferments provided to Lender with respect to the Loans is accurate, but that ED agrees that absent information to the contrary, the Lender may consider all borrowers entitled to all deferments; that the Loans, as of the sale date, are not more than thirty(30) days overdue in payment of principal or interest; that the Loans qualify for sale under the provisions set forth in Section 428F of the Act and applicable rules and regulations issued by the Secretary of Education there under; **that Lender has discretion to establish a repayment schedule designed to pay off the Loan within the time period appropriate for the particular Loan type beginning with the first of the nine full payments received by ED that qualified the Loans for sale under Section 428F of the Act.**

18. The relevant regulations state that the underlying loan must be enforceable:

§ 682.405 Loan rehabilitation agreement.

(a) General. (1) A guaranty agency that has a basic program agreement must enter into a loan rehabilitation agreement with the Secretary. The guaranty agency must establish a loan rehabilitation program for all borrowers **with an enforceable promissory note** for the purpose of rehabilitating defaulted loans, except for loans for which a judgment has been obtained, loans on which a default claim was filed under § 682.412, and loans on which the borrower has been convicted of, or has pled nolo contendere or guilty to, a crime involving fraud in obtaining title IV, HEA program assistance, so that the loan may be purchased, if practicable, by an eligible lender and removed from default status.  34 CFR 682.405:

19. There is no evidence that any payments were made by the plaintiff before 2007.

20. The plaintiff has discovered that the collection is based on a Stafford loan allegedly made in Florida on December 9, 1986. The lender is Florida Federal Savings and Loan. The contract, attached hereto as Exhibit B, is to a Karen L. Adams, in the amount of two thousand, five hundred dollars. The address of the applicant appearing on the contract is today a homeless shelter. The plaintiff does not recall signing this contract and does not recall receiving any checks in the amount stated on the contract. The school address appearing on the application is today that of a car dealership.

21. Contemporaneous articles in the Orlando, Florida, Sentinel, report that Florida Federal Saving and Loan incurred substantial losses in the late 1980's due to the cost of investigating fraudulent lending practices by its Student Loan Division.

22. The Sentinel reported in 1988 that Florida Federal Savings and Loan and two officers were indicted for fraudulently submitting 17,000 student loans totaling thirty five million dollars to the Department of Health Education and Welfare for payment as defaulted, guaranteed student loans. The paper reported that on May 1, 1990, First Federal and two officers were convicted of fraudulently submitting student loans for reimbursement. On information and belief, Florida Federal was a failed savings and loan, the assets and liabilities of which were seized by the Federal Savings and Loan Insurance Corporation.

23. The plaintiff, through counsel, has to date made multiple requests to the Department of Education, the Federal Bureau of Investigation and the United States Courts for documents relating these prosecutions, including but not limited to, the list of 17,000 borrowers which were the subject of the prosecution, the Consent Decree between Florida Federal and the United States government regarding restitution. None have resulted in production of the list.

6

24. On October 8, 2012, the plaintiff received notice that the loan had again been deemed in default, and repurchased by ECMC, another government contractor.

25. On February 26, 2014, ECMC sent the Plaintiff, through Counsel, an application for discharge based on fraudulent certification by the school of her ability to benefit from the alleged educational program that was the subject of the 1986 student loan application. To date, there has been no identification of the nature of the alleged training program.

26. The February 26, 2014, ECMC, letter stated that the plaintiff should receive the discharge based on her lack of a GED, lack of a high school diploma, and because the school on the loan agreement, PTC Inc. (RETS) was on a Department of Education "blanket discharge" list for a pattern of fraudulently certifying students had the "ability to benefit" from the programs.

27. On June 30, 1995, the Department of Education found that PTC Inc.(RETS) engaged in a pattern of fraud with regard to certifying that its students had the "ability to benefit" from its programs. Exhibit C.

28. This copy of the June 30, 1995 letter was obtained from a source other than the Department of Education. In response to a Freedom of Information request for the letter, the Department of Education stated the letter had been destroyed. Exhibit D.

29. Pursuant to completion of the application, the loan was discharged and the plaintiff repaid the accumulated payments she had made, since 2007, without interest.

30. The Department of Education, despite having found in 1995 that PTC, Inc. (RETS) was a fraudulent provider of educational services, nevertheless rehabilitated the loan in 2007, and sold it to SunTrust for further collection activity in 2008.

31. The conduct of the Department of Education was in intentional and willful disregard of its own rules and regulations and its prior finding regarding PTC, Inc. (RETS).   This conduct caused the Plaintiff mental anguish, upset, required her to engage the services of a lawyer, prosecute a case against the purchasing lender and loan servicer, and required her to expend monthly payments toward the unenforceable loan, from her monthly SSI benefits.

32. Based on the list attached with the agreement which included her alleged loan, the plaintiff believes that there are many others in her situation, that is, making payments from limited income to repay loans, where the Department of Education has failed to confirm that the loan did not originate from a school on the so-called "blanket discharge list."

33. The reaffirmation agreement was obtained under false pretenses, based on representations that the loan was valid, that Karen Adams would lose her SSI check if she did not sign the agreement and that Karen Adams could go to jail if she did not agree to make the payments.  The Department of Education knew that the alleged loan was made at a time within the period identified by the Department of Education as the time when Florida Federal made fraudulent claims for student loans to the federal government. The Department of Education knew or should have known that the plaintiff may not have had the capacity to enter into a binding agreement. Finally, the Department of Education knew that the loan which it had rehabilitated was based on an application to attend a school which was on its "blanket discharge list."

34. Karen Adams and others similarly situated have been unfairly prejudiced by the passage of time in responding to the demand for payment from lenders and servicers, in that

documents pertaining to the fraudulent loan scheme are not readily available to the public, memory and recollection have declined over time and the ability to identify and contact witnesses have been severely limited.

35. The Department of Education has promulgated certain regulations governing the sale of Rehabilitated Student Loans.  34 C.F.R. 600.400.04, et seq.

36. These regulations require at a minimum the following:

> 34 C.F.R. § 682.401 Basic program agreement.
>
> (b)(4)(i) For purposes of this section, the determination of reasonable and affordable must—
>
> (A) Include consideration of the borrower's and spouse's disposable income and necessary expenses including, but not limited to, housing, utilities, food, medical costs, dependent care costs, work-related expenses and other Title IV repayment;
>
> (B) Not be a required minimum payment amount, e.g. $50, if the agency determines that a smaller amount is reasonable and affordable based on the borrower's total financial circumstances.  The agency must include documentation in the borrower's file of the basis for the determination, if the monthly reasonable and affordable payment established under this section is less than $50.00 or the monthly accrued interest on the loan, whichever is greater.
>
> (C) Be based on the documentation provided by the borrower or other sources including, but not limited to—
>
> (1) Evidence of current income (e.g. proof of welfare benefits, Social Security benefits, Supplemental Security Income, Workers' Compensation, child support, veterans' benefits, two most recent pay stubs, most recent copy of U.S. income tax return, State Department of Labor reports);
>
> (2) Evidence of current expenses (e.g. a copy of the borrower's monthly household budget, on a form provided by the guaranty agency); and
>
> (3) A statement of the unpaid balance on all FFEL loans held by other holders.
> …
> § 682.405 Loan rehabilitation agreement.

9

(a) General. (1) A guaranty agency that has a basic program agreement must enter into a loan rehabilitation agreement with the Secretary. **The guaranty agency must establish a loan rehabilitation program for all borrowers with an enforceable promissory note for the purpose of rehabilitating defaulted loans,** except for loans for which a judgment has been obtained, loans on which a default claim was filed under § 682.412, and loans on which the borrower has been convicted of, or has pled nolo contendere or guilty to, a crime involving fraud in obtaining title IV, HEA program assistance, so that the loan may be purchased, if practicable, by an eligible lender and removed from default status.

(2) A loan is considered to be rehabilitated only after—

(i) The borrower has made and the guaranty agency has received nine of the ten payments required under a monthly repayment agreement.

(A) Each of which payments is—

 **(1) Made voluntarily;**
(2) In the full amount required; and
(3) Received within 20 days of the due date for the payment, and
(B) All nine payments are received within a 10-month period that begins with the month in which the first required due date falls and ends with the ninth consecutive calendar month following that month, and
(ii) The loan has been sold to an eligible lender.
(3) After the loan has been rehabilitated, the borrower regains all benefits of the program, including any remaining deferment eligibility under section 428(b)(1)(M) of the Act, from the date of the rehabilitation. Effective for any loan that is rehabilitated on or after August 14, 2008, the borrower cannot rehabilitate the loan again if the loan returns to default status following the rehabilitation.


34 C.F.R. §§ 682.406 Conditions for claim payments from the Federal Fund and for reinsurance coverage.

(a) A guaranty agency may make a claim payment from the Federal Fund and receive a reinsurance payment on a loan only if—

**(1) The lender exercised due diligence in making, disbursing, and servicing the loan as prescribed by the rules of the agency;**

(2) With respect to the reinsurance payment on the portion of a loan represented by a single disbursement of loan proceeds—

10

(i) The check for the disbursement was cashed within 120 days after disbursement;

or

(ii) The proceeds of the disbursement made by electronic funds transfer or master check in accordance with § 682.207(b)(1)(ii) (B) and (C) have been released from the restricted account maintained by the school within 120 days after disbursement;

(3) The lender provided an accurate collection history and an accurate payment history to the guaranty agency with the default claim filed on the loan showing that the lender exercised due diligence in collecting the loan through collection efforts meeting the
requirements of § 682.411, including collection efforts against each endorser;

(4) The loan was in default before the agency paid a default claim filed thereon;

(5) The lender filed a default claim thereon with the guaranty agency within 90 days of default;

(6) The lender resubmitted a properly documented default claim to the guaranty agency not later than 60 days from the date the agency had returned that claim due solely to inadequate documentation, except that interest accruing beyond the 30th day after the
date the guaranty agency returned the claim is not reinsured unless the lender files a claim for loss on the loan with the guarantor together with all required documentation, prior to the 30th day;

(7) The lender satisfied all conditions of guarantee coverage set by the agency, unless the agency reinstated guarantee coverage on the loan following the lender's failure to satisfy such a condition pursuant to written policies and procedures established by the agency;

(8) The agency paid or returned to the lender for additional documentation a default claim thereon filed by the lender within 90 days of the date the lender filed the claim or, if applicable, the additional documentation, except that interest accruing beyond the
60th day after the date the lender originally filed the claim is not reinsured;

11

(9) The agency submitted a request for the payment on a form required by the Secretary no later than 30 days following payment of a default claim to the lender;

(10) The loan was legally enforceable by the lender when the agency paid a claim on the loan to the lender;

(11) The agency exercised due diligence in collection of the loan in accordance with § 682.410(b)(6);

(12) The agency and lender, if applicable, complied with all other Federal requirements with respect to the loan including—

(i) Payment of origination fees;
(ii) For Consolidation loans disbursed on or after October 1, 1993, and prior to October 1, 1998, payment on a monthly basis, of an interest payment rebate fee calculated on an annual basis and

37. The Department of Education, having promulgated these regulations, had notice and knowledge of the existence of these regulations and their contents.

38. The Regulations establish certain minimum requirements for the rehabilitation of the loans.

39. These minimum requirements include but are not limited to the following:

    a. **That the underlying loan be enforceable;**

    b. **That the underlying loan had been properly submitted for insurance payment;**

    c. That the rehabilitation be reasonable and affordable;

    d. **That the originating lender used due diligence with the making, disbursing and collection of the loan;**

    e. That the lender disbursement check was cashed within 120 days of disbursement;

    f. That the payments in furtherance of rehabilitation be voluntarily made.

40. The Department of Education had a duty to confirm that the underlying student loan and rehabilitation comported with these requirements.

41. The alleged loan here did not meet these requirements in several, but not limited to particulars:

   a.   The rehabilitation was not voluntary, in that the plaintiff was threatened with loss of her income in order to induce her to agree with the rehabilitation;

   b.   There is no evidence that the originating lender complied with any of the basic requirements pertaining to the due diligence in the making, disbursement and collection of the original loan.

   c.   The Department of Education failed to exercise due care in the rehabilitation of the loan, particularly with regard to the original loan, the reasonableness and affordability of the loan.

   d.   The loan was not enforceable, in that the school at issue was on the blanket discharge list and the plaintiff did not have a high school diploma or GED.

42. The rehabilitation of the plaintiff loan did not comply with the requirements of the law and regulations governing these loans.

43. The Department of Education knowingly failed to exercise the due diligence required by law in rehabilitation of these loans.

44. The Department of Education perpetrated a fraud upon the plaintiff, as set forth above.

45. As the direct and proximate result of the wrongful conduct of the Department of Education as aforesaid, the Plaintiff suffered the loss of money, deprivation of her rights and protections afforded her by the regulations, and other injuries.

## **SPECIFIC RULE 23 CLASS ACTION ALLEGATIONS**

46. The plaintiff restates all paragraphs set forth above.

47. There are two putative classes, each of which the plaintiff is a member and representative.

48. The first class (Florida Federal Loans Class) consists of persons who are the subject of collection efforts based on loans originated from Florida Federal Savings and Loan Association, Inc, Florida Federal FSB, and any other subsidiary or division of Florida Federal Savings and Loan from 1986 to 1990.  Included in this class are the 17,000 individuals whose loans were fraudulently submitted to the Department of Education, as alleged above. These loans were the subject of a restitution agreement with Florida Federal.

49. The second putative class (Defective Rehabilitation Class) consists of all persons who are alleged to have had loans in default which were allegedly rehabilitated and sold to lenders as rehabilitated, where the Department of Education did not exercise due diligence to determine whether the underlying loans were enforceable, and that the loans otherwise met the requirements of law for being deemed rehabilitated. This class consists of at least the loans attached to October 16, 2007 Sales Agreement identified above and attached hereto as an exhibit. On information and belief, the plaintiff states this class potentially includes many thousands of other student borrowers.

14

50. Rule 23(a)(2) of the Rules of Civil Procedure provides that "commonality" is satisfied upon a showing that there are questions of law or fact common to the class.

51. The claims of the putative class as well as the class representatives, as shown above, all arise from the same or similar factual circumstances.

52. Each member of the first putative class (the Florida Federal Class) was, and is being, subject to potential and realized threatening phone calls, damaged credit reports, and the wrongful taking of "loan" payments and subjected to additional expenses as result of the unlawful conduct of the defendants as aforesaid. Such wrongful conduct consists of the collection of loans which cannot be shown to be enforceable Further, such wrongful conduct deprives the class members of notice and knowledge of their right to certain legal defenses, including but not limited to, statute of limitations defenses. The wrongful conduct of collecting loans which are not enforceable constitutes obtaining money under false pretenses.

53. Each member of the second putative class (rehabilitated loans) was, and is being, subject to potential and realized threatening phone calls, damaged credit reports, and the wrongful taking of "loan" payments and subjected to additional expenses as result of the unlawful conduct of the defendants as aforesaid. Such wrongful conduct consists of the collection of loans which cannot be shown to be enforceable and which do not otherwise satisfy the requirements of law regarding rehabilitated loans. Further, such wrongful conduct deprives the class members of notice and knowledge of their right to certain legal defenses, including the failure of the defendants to determine that the loans satisfied the requirement for rehabilitation, as required by law.

54. The Department of Education was under a legal duty to exercise due diligence and care in the investigation and documentation of loans allegedly generated by Florida Federal Savings and Loan Association, Inc. Beginning in at least 2007, the defendant breached this duty to the

plaintiffs. As more particularly plead herein, the class members were all injured as a consequence of the same breach of duty the defendants owed to each class member as a matter of law.

55. As shown above, plaintiff here alleges questions of law or fact common to the class and the claims of the representative parties. Further, the claims of the plaintiff are typical of the claims of the putative classes. The alleged loans from Florida Federal were obtained in the same or similar manner and have been handled by the defendants in the same or similar way. The defaulted rehabilitated loans were obtained in the same or similar manner and have been handled by the defendant in the same or similar way.

56. A representative party's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory. These claims are not required to be identical.

57. The representative party shares the same risk as the putative class members. The representative plaintiff must necessarily protect the interests of the class as they seek to protect themselves; the plaintiff, because of their shared interests with the putative class, is adequate to represent the interests of the class and any sub-classes.

58. The law firm seeking to represent the putative class possesses the financial resources and possesses the requisite experience to vigorously represent the class and any subclass in this litigation. Lead counsel for the Calwell Practice, PLLC, Stuart Calwell, a member of the West Virginia State and New York State Bars, has extensive experience . The Calwell Practice, PLLC maintains offices Charleston, West Virginia. The Calwell Practice, PLLC, has acted as lead counsel in multiple class action cases, in which substantial matters involving thousands of plaintiffs have been litigated.

59. Counsel has through the prosecution of the underlying case familiarized themselves with nature of the claims made.

60. The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the defendants opposing the class.

61. As shown above, the sheer number of putative class members, should their claims be litigated separately, will with certainty result, over time, in inconsistent judgments.

62. Inasmuch as this lawsuit addresses over 27 years of misconduct by the defendant, it is important that the litigation result in clear standards of conduct for future management of student loans.

63. The representative plaintiff, on behalf of the putative class members, seeks equitable relief from the Department of Education in order to stop future attempts to collect these fraudulent loans. The injunctive relief sought is permanent and final in nature as more fully appears below.

64. The representative plaintiff, on behalf of the putative class members, seeks disgorgement of wrongfully obtained monies, including but not limited to repayment of payments extracted from class members, fees charged guarantee agencies and later charged against other borrowers, and such additional monetary damages as the Department of Education may have obtained as a result of its wrongful conduct.

65. As clearly set forth above, the Department of Education has engaged in a course of conduct since at least 2007 which essentially guarantees continued wrongful collection of fraudulent loans allegedly made by Florida Federal Savings and Loan, Inc., and

collection of loans which the Department of Education knows originated from lenders and schools which it has previously deemed fraudulent.

66. The plaintiff is informed and believes that 17,000 fraudulent loans were identified by the United States Department of Health, Education and Welfare, as originating from Florida Federal Savings and Loan between November, 1986 and July, 1987.

67. The Department of Education has failed to exercise due diligence in the acquiring and collecting of these loans, as set forth above.  Limited investigation would have revealed the Orlando Sentinel articles and alerted the defendants to the probable fraudulent nature of loans originated by Florida Federal during that time.  Any student loan generated by Florida Federal Savings and Loan is tainted and should be subject to strict proof.  Limited investigation would have revealed that the school allegedly providing services in the Adams loan was on the "blanket discharge list" and that she did not have a GED or high school diploma, and that her loan, therefore, was not **enforceable.**

68. Plaintiff is informed and reasonably believes that others in her circumstances may be or have been subjected to collection of these fraudulent loans, including but not limited to being coerced into signing invalid reaffirmation agreements, making minimum payments and making claims for forebearance and waiver due to disability.  Thereafter, in the event the borrower again falls behind in payments, the loan is deemed in default, repurchased by a guarantee agency, sold again to a new lender, all to the detriment of the borrower, and without the exercise of due diligence in the investigation of the claim.

69. As a result of such conduct, the defendants have unjustly shifted to other borrowers the cost of collection related to these fraudulent loans.  Under current law, collection costs for loans are averaged and apportioned among borrowers at the point of default, which is

a measureable cost.   Other borrowers should not be charged measurable costs for the collection of fraudulent loans originating from Florida Federal Savings and Loan, Inc.

70. As the direct and proximate result of the wrongful conduct of the Department of Education, as aforesaid, the plaintiff classes have suffered by paying money to the Department, through its contractors, banks and collection agencies under false pretenses, suffered the substantial deprivation of their civil rights, including the right to asset the defenses of laches and statute of limitations, the inflection of emotional distress, and other damages.

Wherefore, the plaintiff prays:

- that she be appointed class representative for the classes defined as a foresaid;

- that Counsel be appointed class counsel;

- that the Department of Education be directed to produce a list of the names and addresses of all persons currently or in the past who were the subject of collection efforts as a result of loans originated by Florida Federal Savings and Loan Association, Inc.;

- that the Department of Education be required to produce a list of the names and addresses of all persons currently or in the past who were students at PTC (RETS) and whose loans were sold for collection purposes after 1995;

- that the Department of Education be required to direct all contractors, banks and collection companies to cease and desist in all collection efforts for loans made by Florida Federal Savings and Loan, and/or in which the alleged services were to be provided by PTC (RETS);

- that the Department of Education be required to identify all contractors, banks and collection companies which it knows to have purchased loans from the Department for further collection efforts, where the lender was Florida Federal Savings and Loan, and/or in which the alleged services were to be provided by PTC (RETS);

- that the Department of Education be required to repay with interest all payments made by members of the class based on Florida Federal loans from the relevant time period and /or payments made by members of the class based on programs allegedly provided by PTC (RETS) in the relevant time frame;

- that the class be reimbursed for its expenses and attorneys fees, and such other relief as the Court may deem appropriate.

The plaintiff demands a jury trial for any issues so triable.

**Karen Adams**
**By Counsel**


/s/ John H. Skaggs, Esquire
Stuart Calwell, Esquire (#0595)
John H. Skaggs, Esquire (#3432)
Benjamin Adams, Esquire (#11454)
The Calwell Practice, PLLC
500 Randolph Street
Charleston, WV 25302
Phone: (304) 343-4323

---

[i] Letter to John H. Skaggs from Diane Zitur of ECMC, dated February 26, 2014

20